I picked up the wrong. That's all right.  I'm Kathleen Hamel for the defendant appellant, Michael Reyes. Morning, counsel. Mr. Reyes stands convicted of two counts of first degree murder. Two brothers, Jesus and Francisco Montoya, were found shot to death in their family's van on March 9th, 1993. 14 years later, Mr. Reyes was charged with those murders. And this trial began 5.5 years after his arrest in January of 2013. So we have two issues that we raise in this appeal. Both are at least tangentially related to that significant time gap that passed in this case. We argue first that the state did not prove the defendant guilty beyond a reasonable doubt. And second, that further proceeding should be held on the question of whether the 14 year pre-indictment delay prejudiced his ability to have a fair trial and deprived him of due process of law. As far as a reasonable doubt claim goes, it is very fact heavy and we discuss it in the briefs. So I'm just going to quickly dance over the- Why don't we go to your second issue first and then we can go back. Okay, so that would be fine. For the pre-indictment delay, again, 14 years passed between the murder and the filing of the indictment, the defendant did file a motion to dismiss the indictment based on this. And at the hearing on that motion, the court applied the Lawson test, which was the right test to apply as to whether or not pre-indictment delays caused the denial of due process. In the first step of the Lawson test, the defendant has the burden to prove or to show that the delay caused actual and substantial prejudice to his ability to have a fair trial. If he's able to do this, the burden shifts to the state to show that the delay was reasonable. And if the state is able to do that, then at the third step, the court would- Does it balance? Balance, yeah. Considering things like the length of the delay, which here, 14 years, is significant. And the seriousness of the crime, which here is a double murder, which is also significant. So you can see that the balancing would be rather tricky in a case like this. Now, you indicate that there are two ways that the defendant was prejudiced. Yeah. In at least two ways, one of them being unable to obtain the time records because they were destroyed. What would the time records have shown that would have tipped the scales here, that would have changed anything? Well, to some extent, this brings me back to my first argument. Three of the witnesses that the state came up with were former Latin kings who exchanged their testimony against the defendant, and it was all basically the same kind of testimony. They all claimed the defendant had confessed to them at different times for very, very favorable plea deals. One of them was unable to remember when or where this confession happened. That would be Carlos Escalante. So you're talking about when they were standing in the corner watching? No, no, I'm going to give you a little backup for why this is significant. One of them is that Carlos Escalante really doesn't know what he's talking about. Yeah, yeah, well, Juan, the second one, Juan Escobedo, how do you say that, Escobedo? His story was belied by proof that Abraham Estramera could not have been present at the time that the confession supposedly was made him. So that knocks out two of them. The only one that was left- But would that have had anything to do with the work records? Well, it would- I thought the work records had to do with that statement on the corner. That's what I'm getting to. The only one that wasn't knocked out already was the one that he made to Carlos Olivares. And Carlos Olivares is the one who claimed that on the day that the bodies were found, he encountered the defendant who just gratuitously confessed to him that he had committed the crimes. But did he testify as to what time they were on that street corner? Well, I thought it was 10 o'clock. Joan Kripke believes it was 2 o'clock, and she might be right. I did not get the record back to make sure about that. But it doesn't matter. It was during the work day. The defendant worked between, I think it was 8. And we know when he worked because of the testimony of Dennis Sorvo. And he says that work records would have shown that he was at work that entire day. So at any of the times that he would have been, Olivares would have had him confessing on the corner, he wasn't there. He couldn't have been there. However, he was unable to obtain the work records because after seven years, they were destroyed. And after 14 years, it would be extremely difficult to come up with any other way to prove that, to come up with another co-worker who might say, yes, on that day, he was there. None of us can do that. So that was significant. But we think even more significant, if anything, is the loss of the identity of an informant who told a police officer early in the investigation of these crimes that the murders were committed by two men from Chicago, Victor Cortez and Hector Martinez. Apparently, Officer Miles did not write down the name of the informant. And when the state tried to get that name from him more than 14 years later, while they were preparing to take the defendant to trial after he was charged, the officer no longer had any recollection as to who said that to him. But didn't they give the exact names of the individuals and where they lived? And did you or defense ever search for those people? They did get, they gave- I mean, the informant wouldn't have given you any more than what was given to you. Well, what they gave was the names of these people who, in 1993, they had a coroner in Chicago, Kedzie and something. And so it wasn't really an address. It was just a location. The defense did make, or I'm pretty sure the defense made an effort to try to find them, but they had disappeared into the city. And besides, they wouldn't really be the important witness to find because they're highly unlikely to come in and testify, yes, we did commit the murder and not the defendant. It's the informant who we wanted because the informant could have told us how he knew that. Perhaps he was there, perhaps- You're not talking about the informant testifying as to that, because wouldn't that all be hearsay? Well, if the informant was present at the killing, it wouldn't be hearsay. So your point is, you don't know how the confidential informant knew that information. And the only way you would know that is if you could get his name and go talk to him. That is one thing. We also don't know whether- Hold on. Isn't that all speculative? It is. It is. As far as whether this would really establish something. But what isn't speculation is that this person existed who said it because we have it in a police report. I'll grant you that. Let's assume for the sake of argument, there was a confidential informant. He, I'll assume it was a gentleman, comes to the police, says, I think these two other guys did it. That's it. Now, anything beyond that, would it be admissible what the confidential informant knew? And isn't it then, in order for that testimony to be admissible, he would have had to have been there or had some other competence to testify? That's the part that's speculative. And how do we get around that? Or how do you get around that? Well, our position is that having the police report alone is a substantial showing. And part of what we would ask this court to do is to consider that it's rather unreasonable that the police did not write this down. Even if the police were terrible, and this was just sloppy, sloppy police work, what you're saying that the confidential informant, how that would have helped my case is speculative. Because you don't know. Yeah, that is true. That is true as far as exactly what he would say. But it's not speculative as to whether or not it would be important to the defense to have access to whatever it might be that he would say. Right. And you're looking at the people versus homes, the three-part step. Yes. So you have to establish that the testimony would be material to your defense, relevant and helpful to the accused defense. Then the burden shifts. But then the third step, I think what Justice Jorgensen is getting at, is you have to show that the informant's testimony would tend to be exculpatory or would create a reasonable doubt as to the reliability of the prosecution's case, either through direct examination or impeachment. That third step is a very high burden for you. The question I think Justice Jorgensen is asking is how do you overcome that burden in step three? Isn't what you're stating speculative? And is speculation enough to overcome that burden? Well, if we look at what we know that what the informant would say is that somebody else committed the murders. The confidential informant always says that if there's a basis for that statement. Right. Where's the basis for the statement to make what you propose the confidential informant would say or would testify to? Where's the basis for that? I agree with you that we have nothing more than the contents of the police report. Was Wayne Miles ever interviewed by the defense? He was interviewed by the state. The prosecutors went and talked to him and he and the defense. Was there an attempt by a defense investigator to interview the record? The record doesn't show anything like that. I think they just took his word for it. How many of the again, how many of the informants were jailhouse snitches? You mean witnesses? I think I think it's it's it depends on who you count. But I believe five or six were there to be a jailhouse informant. I'm talking about statements that were made by the defendant to somebody who was in custody with him. How many of those were there? Well, for that, there was two. There was Michael Rodriguez and there was Craig Renzelman. And were there hearings under 115-21 informant testimony hearings? Subsection D with a request for hearings on reliability. This is on his face. This is a capital case, right? Double murder. Yes. So there should have been a hearing on reliability, correct? That's true. No. Do you know why not? Was it waived on the record? I don't recall. Now, going back to this question, these confidential form, I think the defendant was indicted. It wasn't until a year later that he ever asked for any information, requested the idea of a confidential informant. So was he guilty in a little bit of a delay? I know it's only a year, but. Well, I wouldn't say so. I mean, he would this would be something that would come up in discovery. There also was a fair amount of attorneys switching at the beginning of this case. I know Liam Dixon was on originally and then I believe Theresa McAdams and then the public defender. And so and on top of that, he was also, I believe, charged in another case and was facing trial there. And then the state had elected to go on that the other case first. So I think with all of that, I think it would be understandable why it might take a little time. So those are the two issues with respect to the delay. Do you want to talk a little bit? The time you have left concerning a reasonable doubt is simply that we have the defendant stands convicted basically on the accounts of people who are based on the accounts of people who say that he confessed to them. Now, one of them is a person who he would be the least likely to confess to. As I said earlier, the three former Latin kings who testified, two of them were there. Their accounts were undermined on the record. Acevedo was undermined because he claimed that the confession was made in the presence of Abraham Mastromera, who was in fact in federal prison at the time that he claimed it happened. Carlos Escalante, simply that he couldn't place it in the time or place. He just said it happened. And then Carlos Olivarez, as I said, is the one that we are talking about right now with the work records. Besides those people, he there was a dentist or bell who supposedly a coworker who the defendant had as nearly a casual acquaintance. And on the very first time to have lunch together, a day after the bodies were discovered, we believe that the defendant decided to gratuitously confide to Mr. Sorrell that he had committed a double murder. Well, isn't he probably the least bias of all of the witnesses? I mean, what would his bias be for making this up? Then he calls the guy in like Colorado or something. What would the what would his basis be for making something like this up? Well, I mean, I think you can attack the credibility of the others question unquestionably. Well, the thing with him is that first of all, he doesn't call the police right away, he calls a friend and he has access to the news. Of course, he's local. He's going to have all the news stories. So he tells his friends that his friend is a college student who is looking for a creative project and he is happy to feed him details in order to help the guy put together a creative project and the possibilities for being motivated just to kind of kind of a self aggrandizing. You're asking us to reweigh the evidence, though, that the testimony of a single credible witness is enough to sustain the convictions. That's true. And Mr. Sobel testified and then he he acknowledged everything that he originally said many, many years later. One other point about him is that the police and the state's attorney had his testimony in 1993 and they didn't charge the defendant on the basis of it. And that shows that there was something wrong with it. The police may not have wanted to or the prosecution may not have decided to charge. Doesn't impeach the jury's decision to believe the testimony. Prosecutors make those decisions all the time. They forego prosecution because they just don't think they have a strong enough case. And some other prosecutor comes in and says, you know what? I think it's enough. We're going to charge the case happens all the time. Well, it just it's it seems odd that they would have a confession and not go on it, though it really does. And as you say, especially from a witness who's not particularly biased and then wait until they had many biased witnesses instead. Quality is more important than quantity. And it actually it may even go to the unreasonableness of the pre-indictment delay. No, there are some consistencies, though. I think you can't deny the consistencies. Olivia said he gave them the 40 gave him a 45 caliber. Gino, one of the brothers, said that they took with them a quarter kilo. And the defendant told Olivia that he took a quarter kilo. And I think he's Olivia said he viewed the cocaine. So and then Ascalante said that the defendant told him they raised their hands. And indeed, one of them was shot through the hand. And Rodriguez said that there was no number on the pager. The defendant talked to him about how he was surprised that his number didn't show up on the pager. I mean, these are consistencies that isn't that sufficient for the jury to make that determination? Well, the problem with the consistencies in this case, again, is it's kind of it ties to the passage of time because none of these things are things that wouldn't be available to people, especially like the Latin kings, which I'm sure is a rumor mill. And the you know, are just on the street and in the news and people talking about things. I mean, the police were flooded with with with, you know, we know who did it, sorts of calls and stuff, you know, and including this conversation that we're talking about. There's a lot of interest in this case. And so I think that it's safe to say that the defendant is not the only conceivable source for this sort of information. Well, go back to Sorbel. Sorbel's testimony, which was provided very early, was not tainted by the publicity about the task force or the murders. That was raised many years after he came forward. Well, he would have, though, been in a position during that first month of, you know, reading newspaper accounts and perhaps speaking to people on the street, but certainly reading newspaper accounts. Well, there was probably an article or two about the murders in Aurora during that period of time. They had a lot of murders. So you get one murder, then the next murder takes over the headlines. Yeah, but there was also there was some some coverage in the news and he would have a heightened reason for paying attention. He acknowledged that he read about it after the defendant made a statement to him, not before. I thought he acknowledged that he had had exposure to news stories prior to talking to the police. He read about it, read it in the newspaper after the defendant confessed to him. Oh, OK. Yes, that's true. But then he didn't talk to the police until the end of the month. And you know, detective Gower testified that the defendant had told him that he had paged Montoya, the Montoya brothers on March 8th, correct? Yes, but that is not necessarily an incriminating fact. The Gino Montoya also said that the even though they were intending to meet the defendant in some way, shape or form, and they didn't think it was necessary to bring a gun and they were on friendly terms. That doesn't necessarily mean that they were going to meet him, that he was going to kill them and he was going to go over there after having met with the killer. But it is corroboration of the otherwise what you think is tainted evidence because these are all former Latin kings, criminals, people getting favorable dispositions. But that doesn't that testimony tend to corroborate those confessions? Well, it does, but it also corroborates an alternative theory that the meeting with the defendant was a benign thing, that there was that it had nothing to do with this. You think there's a lot of benign meetings between Latin kings? Well, this is they apparently were friends. The family knew who the defendant was. They had dinner over there and everything else. They were they were comfortable together. Okay, well, for the reasons that we've given here, if your honors decide not to reverse the convictions outright, we do ask that this cause be remanded for further proceedings on the motion to dismiss the charge on the pre-indictment based on the pre-indictment delay. Thank you. Good morning, your honors. May I ask that I address the court briefly about our colleague, Jay Hoffman, who was supposed to have argued today but passed away last week. Jay and I had offices that were next door to each other, and frankly, I don't know how Jay got any work done because I was always in his office saying, Jay, what do you think about this? And what would you respond to this? Does my argument, does this make sense? And Jay would very patiently and quietly just hone right in on the essence of any legal argument and explain it or offer an alternate theory or tell me why my argument was good or not good. And sometimes when they were really complicated arguments, I would say, Jay, repeat it to me. So I made sure I understood what he was saying, and he would just go through it again. He had this amazing ability to explain. He was a consummate teacher. And an anecdote that I've told my colleagues, years ago when the AG allowed me to brief and argue one of my cases that was in the Supreme Court, I went down to the AG's office to be mooted, and Jay was working for them then, and he was on the thing. I don't know how many people they had in this room. People asked me questions, and I answered it. Jay, whom I had never met, asked me a question that just came from left field. And I had been immersed in this case, and I looked at him, and I said, I have no idea what the answer is. What's the answer? He gave me the answer, and I wrote down the answer, and I wrote down the question. I think I asked him again to go over it with me because it was really confusing to me. I mean, I just hadn't thought about it. Sure enough, when I was in the Supreme Court, one of the justices asked me that exact question, and I pulled out, I kind of smiled, and I pulled out my little three-by-five card, and I read Jay's answer. And then I prayed that they didn't ask me a follow-up question because I didn't have Jay there to tell me that answer. He was that good. And when he used to come into court, I was so looking forward to seeing him argue again. He would stand here calmly and clearly and competently and confidently, but never with any arrogance, explain the state's position. And it was a way of argument that I wish I could emulate. And as I said, I really looked forward to seeing him to take mental notes again about how Jay did it. And so all of us are civil servants in this room, and we all work within this judicial system, and we all understand our roles. Sometimes we win, sometimes we lose.  Sometimes you're reversed. And we go on from there. I mean, we adjust procedure, we adjust the law, and we all work with each other to do what our roles are here. And so when I see people or hear people disparaging attorneys or making slurs against prosecutors and most recently just aspersions cast on the judicial system of this state, I just want to say for anybody who listens to this, and in this court in which Jay practiced and in the judicial system which Jay served, that Jay Paul Hoffman was the consummate civil servant, and he served the people of Illinois with great intellect and great integrity. And the ultimate epitaph I can say for Jay is that he pursued justice, and it was my great privilege to have worked with him. Thank you. Thank you, Joan. And he will be missed very much. And now on behalf of the people of the state of Illinois, may it please the court, counsel, would you like me to address the guilty, the reasonable doubt argument, or the other arguments first? Why don't you start the same way, Ms. Crockett? Well, I divided their second argument into two. In regards to the work records, we don't think that the defendant ever proved up the prejudice, because when their investigator went to BRK, they said, do you have these records from 1993? They said no. And on cross-examination, they said, so what records did you ask for? And they said, well, they didn't have any records. They didn't ask for anything specific. So we don't even know what the records they had could have shown. I mean, maybe they were just pay stubs for a two-week period. Well, wouldn't the records have shown that he had worked that day, and perhaps what hours he worked, or even if he had pay stubs, you could probably determine what his pay was and how many hours he worked on that particular day. There's speculation. I get a pay stub every two weeks. It gives me a lump sum. It does. If I take a vacation day, it doesn't show it. It doesn't show sick time. It shows he's an hourly worker. He's an hourly worker. But we don't know. We don't know. Do you think that someone at a job like his was being paid a salary? Sorry? Do we know whether somebody at a job, typically at a job like that, was being paid a salary? Probably not. He probably was an hourly worker. But without having asked what type of records they kept, we simply don't know. So it's speculation. And then the investigator did not go back to the temp agency that had placed him at BRK to ask them if perhaps they had something, or even say, well, what kind of records should have been kept, or what could I have found? So we're out here in the dark. We don't really know. But let's presume that, well, first of all, the crime occurred at night from March 8th to early morning hours of March 9th. And Sorbella said that they worked from 8.30 to 4. Well, I don't think that the issue was whether he was at work at the time the murder occurred. I think the issue was, was he on the corner viewing police officers casing the scene with this other individual? I think that's the issue. So first of all, they couldn't have exculpated him. Second of all, Carlos Olivares said that he received a phone call in the morning of March 9th from his cousin, Fernando Roman. And he met with Roman at 10 o'clock in the morning. And Roman told him. Roman's now dead by the time of the trial. But apparently, Roman must have spoken with the defendant and told him what the defendant had told him. So all Carlos Olivares says is, later in the day, I met up with the defendant. And I'm going to dovetail something for you, being the devil's advocate. This is Mr. Olivares who received $40,000 from the government for relocation. OK. But we know that. And the jury knew that. And they knew they're all bad guys. And they know they all got all kinds of perks and reducements in their sentence. But they still convicted him. On that point, why were there no reliability hearings for the jailhouse informants? I don't know. It was not, as I recall, I have no recollection of it. They're required by law. The court has to conduct the hearing unless the defendant waives it. Was there a waiver on the record? I don't believe so. I just don't, I don't know. I don't recall reading it. And I don't recall that statute number. That's 115-21. I just don't recall it. Jailhouse informants. And at the time that these cases were under investigation, by the time they were charged, that was part of the capital litigation reform. But this was never charged as a capital case. It is a capital case if it's a double murder of natural life. Right. Natural life. If you're eligible for natural life, it's still considered capital. You could be held without bond. It was not, as far as I recall, it was not. I just don't recall it ever coming across. Was it raised in this appeal? No, it was not. Go ahead. If you want to tell me about Olivares. Okay, so Olivares said that while I was talking with the defendant, we could see all the Mars lights and all the hubbub going on around the van. We know that the van was located at 2 o'clock. The police showed up at 2.20. So the earliest they could have been meeting was 2.20. I then went through the record, went through all the evidence. I was trying to figure out, well, when did the investigation end? And what I found in the record, I think it's on page 47 of my brief, page 47. One of the police officers said that the van arrived at the police evidence garage at 4.30. So sometime between 2.20 and 4.30, the van was towed. I have no idea. And that does not mean that the investigation ended. That means that they cleared out the van. But that doesn't mean they weren't investigating around the perimeter of where the van had been to look for other evidence. And we have no idea when that ended. So presuming even if the defendant had worked at 4 o'clock, again, there's no evidence in the record of where BRK is in relationship to the site. Maybe the defendant could even have gotten there. And who knows how long that investigation went on. Maybe he got there at 5 o'clock and it was still going on. So it's not completely out of the kind of imagination that this could have occurred. How about the confidential informant? Which one? Oh, you mean confidential informant. Oh, yeah. I'm sorry. I thought you meant here. We're still on the 14-year delay. I know in your briefs that you indicate that the defendant was not impaired with his ability to defend himself based upon the lack of a confidential informant. How do you submit that? OK. So first of all, we don't know if the CI witnessed this crime. And if he didn't, he or she didn't witness it, it's hearsay. Couldn't have testified anyhow. But let's go back to the report itself. It could be a hearsay. But how about the defendant having an opportunity to interview and question this confidential? But they kept saying in their brief, we want to find out who the real killers were. Well, they renamed the real killers. If you want to believe the CI, the CI said Victor Cortez and Hector Montanez were the killers. And this third person, Michael, no less. But wouldn't you really want to put that confidential informant on, assuming that they had a reliable basis for making that statement? A reliable basis is not the same thing as being a witness. They can't be brought in if they're not a witness, an eyewitness. Okay. That's what I meant by some reliable. Like, maybe we weren't standing right there. Maybe we're around the corner. But whatever. The point is, wouldn't that have made a significant difference to this case? Maybe. It might have if the person was credible. Was there ever any, anything? I mean, we have to sort of put that in context. If you want to call these guys credible. Wouldn't that, is there anything suggesting that the confidential informant was a witness to the murders? I'm sorry? Was there anything suggesting that the confidential? No. I didn't read anything. I read nothing. That was the point. That's the problem. When you say these guys, I do want to encourage you. I made the table. And I hope, because I was going nuts trying to read this and to keep straight who said what and when. And it really made it clear to me that, first of all, not out of all these people, nobody had the complete story. But I'll go back to that. Let me answer the question about the CIA. So the third person named in the, in Wayne Biles's report was Michael No Last Name. But let's see what Michael No Last Name said or was said about him and how that may or may not have been corroborated by these other witnesses. So first of all, it's not inconsistent with some of the other testimony. Because Gino Montoya said his brothers were going out to meet with the defendant, first of all, and some other individuals unknown to us. So that would go along with what the CIA was saying. These two guys from Chicago and this Michael person. We know that the defendant paged the Montoyas that night. And eventually, and how do we know that? How do we know he paged them? Because his number appeared, because Wayne Gower had the pager. The pager had five numbers on it. He gave the pager over to Michael Dabney. He said, find out who these people are. Dabney tracked the numbers down. One of them belonged to the defendant. They then went to the defendant's house. They finally got him. I'm not sure which. He came in voluntarily. I can't remember which day it was. After they had searched his home on March 10th, they couldn't find him on March 9th. And he came in and he voluntarily came in. He said, oh yeah, I paged them. I was trying to get a hold of them. I called them to come over and get high with me, and they never answered the page. That was what he said. So he admitted it. So that's part of the little bit of real forensic evidence that we do have in this case. And so there were other statements. So Gina Montoya said that this page had come in, that they were going to meet him. Dabney said the number belonged to him. The defendant admitted it. Gower said this is a statement made to me. Escalante said- Regarding Dabney's statement, was that memorialized in a police report, or was that just Dabney's recollection? Well, I don't see the police reports. Pardon me? But we don't see the police- In the record, was there any evidence that he had documented that conversation he had with the defendant? I don't remember. I just remember him saying that, you know, this was my job. I went out to go and look at the numbers. And he listed all the other numbers of the people there. Sorbel told him, Sorbel stated that the defendant told him that he had met the Montoya brothers by, quote, setting up a drug deal between myself and a gang member out of Chicago. So, you know, Sorbel, where would he come up with that? And Michael Rodriguez also corroborated that the defendant, this statement, that the defendant said to them that he had set up the deal. And Escalante said it as well. So all of those- But didn't the testimony that Rodriguez testified to, he testified that the body position was inconsistent with- Yeah, he did. And I was looking for this and I couldn't find it. So what the statement, the statement that Biles wrote down from the CI was, I'm quoting this from page 49 of my brief. It's page 160 in the record. Quote, Michael was seen in the front seat with the brothers in Montgomery about 2300 hours, March 8th, 1993. Michael was in the front passenger seat. Escalante said the defendant was sitting in the front passenger seat. Sorbel said the defendant told him one brother was across from him and one was next to him on his left. Now, when you look- Again, speculation, argument, whatever. If the defendant was in the front passenger seat, I thought I had read somewhere that he said they moved to the back seat to do the drug deal. For sure, the driver was no longer in the driver's seat because the two bodies were found in the back seat. And one of them was curled up and one of them was sitting on some kind of a stool and had been knocked over, if you look at the pictures. So nobody was in the driver's seat. So if the defendant also had moved back to the seat, then he had- If he's sitting here, then one was to the left and one was across from him. I guess I didn't think about this. I would have to go back and look at the pictures of the van and see. We don't know if Estramera was in the van, too, or even Hernandez and Cortez. Was somebody sitting on the bench seat and was that covered in blood? Because if he was sitting in the front seat when he covered, then blood would have sprayed over onto the other side of the passenger seat. I don't remember what the picture- There's a lot of speculation. It's a lot of speculation. I'd have to go back and look. I didn't want to really dwell on those photos to tell you the truth. Why don't you wrap up, Joan, Ms. Kripke? Hit the points you want to hit real quickly and wrap up. We think we proved the- We know we proved the defendant guilty without a reasonable doubt. There was- The jury had before it all the knowledge about who these people were, that they were convicted felons, they had gotten all kinds of deals. They also had before it lots of evidence, but no one person told a complete story. No one person told a story with all of the evidence necessarily being correct. That tells you one thing, that there was not a concerted effort to get together and to tell a story. I thought Rensselaer's testimony was very damning, especially because he had the color of the van wrong. And if he had indeed gone through the defendant's belongings, which I doubt he would have given. He was this 18-year-old kid who was scared out of his mind and state felon. I have this guy telling him about having committed a double homicide. I doubt that he would have touched his belongings. And I just did want to go back to a couple things about the questions you were asking about Acevedo and some of the other people that had testified about before. Acevedo and Escalante were in- I believe both of them were in prison at the time the homicides occurred. And so Escalante, he wasn't reading anything that was in the press. And I also believe that Sorbel also would have been corroborated. First of all, if the work records had shown up and shown him to have been at work on March 10th, it would have corroborated Sorbel's story. But Sorbel knew information that the defendant says, well, it was out on the street, it was known. I saw nothing in the records that showed anywhere that it was known on the street or something was presented that said they knew that there was a .45 caliber gun and knew that there five shots had been fired. When Sorbel said he was talking to the defendant and he was eating lunch, that was at the time Dr. Cipolla was finishing the autopsies. So nobody but Dr. Cipolla knew at that time how many shots had actually entered the bodies and killed these two men. And for these reasons, we believe that people- I do have one other question. This is sort of a bottom line. The trial court had ruled that the state was to produce the name of the confidential informant. Right. And at that point, you are to produce it, or if you're unable, establish a good faith effort. So my question is, is coming back and saying the police officer just doesn't remember, how does that measure up to a good faith effort? He didn't have to- well, he went back to them and they questioned him. I thought there were two different people who testified about it, too. They went back. He said, I don't remember. I don't have any notes. I don't know what else, 14 years later, of course, that they can do. And I do want to say that there was a 15-month gap between the time when the defendant did receive the information and when they decided to go around and start looking for the CI to see what he said. So there was a delay that was also incurred by them. They received the information about the CI in July 2007 and didn't start looking for him until October 2008. Regardless, the lack of a good faith effort would have to go back and show also that there was not a good faith effort on the part of the prosecution back in 1993, that they had hidden something, that they hadn't revealed something. Does it go back to 1993? Is the good faith in the test that you have to, that the court has to do, the people versus Holmes, does it say that you go back to that date for good faith or is it the time that the information is requested? Well, I guess my question then would be, they went and asked the man for the information. He said, I don't remember. I don't have any notes. It's both. You look at the entire time frame.  I mean, a police officer can't take information and intentionally suppress it if it's relevant, but he didn't do that. He took the information, documented it, which is how the defense found out about it, and years later he can't recall it. He can't recall it and then they didn't. So the question is, I mean, is that a lack of good faith? Because do you think that the state waited 14 years to prosecute him just to hope that this guy would forget? My question is, how does that measure up? How do you justify that as a good faith effort to attempt to find the identity of this confidential informant? Did more need to be done? Right. What else? I guess, well, you know, you say it's 14 years. He didn't remember. It's also 14 years for the defendant to try to create an alibi or to remember where he was or to get records. So I hear the state on one side saying, police officer didn't write down, he doesn't remember. It's 14 years. But on the other hand, this very high burden of the defendant having to show actual and substantial prejudice. So the bottom line of my question is, is that good faith when the police officer just says, well, I don't remember? What else did you do or did the state do, if you know, to try to determine? Somebody went out and tried to find these guys. And we know that because it's in the record? It was in the record, and now I don't remember. If there was a hearing, direct me to kind of the pages, if you know. I can't. I remember, let me see if I have the pages on. I simply don't remember if the state went back and looked for these people. Somebody said they couldn't be found. Um, so probably it was the defendant who said, well, we went to 22nd and Kedzie, but I don't remember when they went and tried to find these men. I don't remember if it was at the time or if it's now and they're looking for it. And, and Biles was not brought in. You're right. Biles was not brought in. So nobody said to him, did you go out and try and find these guys? Respectfully, isn't that the state's obligation to establish its good faith effort? When the trial judge says you will disclose that. What did they do? Other than say, he doesn't remember. He doesn't remember. So is the good faith effort, then what you're saying is if you don't have, if you're not going to give us the CI, then you have to tell us what you did to try and locate these men. I think that's kind of what the law requires is for you to establish a good faith effort in order to try to identify or determine the identity of this confidential informant. I can't answer that because I simply don't remember that testimony. There wasn't a lot of testimony about Biles. I would say, I'm going to ask you this quickly. I apologize. I'm going to ask you to wrap up because you're well past your time. I would say, however, that regardless of when you get back down to it, because of the enormous amount of circumstantial evidence that corroborated a little bit of forensic evidence, number of shots fired, caliber of the gun, the defensive wound, and the pager information corroborated by varying people across the board, different situations that the defendant could never have proven prejudice, even if we could have brought in that CI. Because they never could have met their burden in the end. Because it never would have overturned the convictions. Because there was too much going on there that pointed to the defendant as the killer of Jesus and Francisco Montoya. Thank you. Ms. Hamill, just briefly, Ms. Kripke brought up a good point. The jurors have the same information that we have today. They knew that these witnesses all had prior convictions. They knew that they all had been given a deal, all have been treated nicely, if you will, for giving their testimony. So the Collins case tells us it's not within the problems of this court to retry the defendant. But the jurors, that finder had the opportunity to assess the credibility of these witnesses. How do you suppose that we reverse what the trial court did? Well, this court does have the authority to review what happened and to determine whether or not the jury's determination was contrary to the manifest weight of the evidence. In this situation, we ask you to give it a good look because of the fact that we have a quantity rather than quality problem with this testimony. Because it was all very flawed and there is so nothing really, physically, that ties our client to this crime. And so it really is just relying on the credibility of people. And we agree that that is the jury's province. But a jury could be kind of swept away by the sheer quantity of the tales that were told at this trial. And we're hoping that with a more dispassionate review, this court will evaluate it at a higher level. I did want to say that in Officer Biles' report, I noticed this just as I was preparing for this argument. In fact, what was written is somebody named Michael, which was never established that this was Michael Reyes. There's many a Michael in the world. Michael set up the meeting between the suspects. Michael was seen in the front seat with the brothers, etc. So somebody saw Michael. And whether it was the CI himself or whether it was somebody that the CI could have led the defense to, somebody did see it. So that does imply that there was a witness to the shootings. Maybe one of these two guys that you mentioned. Possibly, yes. And again, these two guys who in 1993 supposedly committed double murder, then returned to Chicago. The idea that anybody would be able to find them without having somebody like this confidential informant who knew specifically who they were, that would be a Herculean task. There'd be no way to do that. As far as the good faith, whether or not the state made a good faith effort to find the confidential informant, I think you're right that we look at good faith at the time that the request is made for the informant, because that's when the state has to do it. And what we always have on the record is the prosecutor saying, I talked to Officer Biles and he doesn't remember anymore and he didn't write it down. But I, again, would like to make the point that there's this sloppy police work that underlies this. Back in 1993, why in the world wouldn't he write down the name of somebody who tells him that somebody who committed the crime? And so we say for that reason, because the way the delay plays in with that, that that is an example of the prejudice. Sloppy police work does not mean that they did not act in good faith when the information was requested. Right. And that's why we didn't base our claim on the disclosure of the ID. However, we do say that the situation that that created was a factor. The delay is a factor in that, because if he had been prosecuted based on Soribel's testimony back in 1993-94, surely Biles would have remembered at that time. So for all these reasons, and for those in our briefs, we ask to either to reverse their convictions outright or his conviction outright, or to remand this clause for good. Thank you, ladies. The decision will be rendered in due course in a brief recess until our next case. Thank you. Thank you. Have a great day.